UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LEROY DOUGLAS,                      :
        Plaintiff,                  :
                                    :
v.                                  :    Civil No. 3:03cv1541 (JBA)
                                    :
M. SWIFT & SONS, INC.               :
        Defendant.                  :

RULING ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [DOC. # 15]

Plaintiff Leroy Douglas brings an employment discrimination suit against M. Swift & Sons, Inc. ("Swift & Sons"), his former employer, alleging that Swift & Sons laid him off in November 2001 because of his race, in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq. See Amended Complaint [Doc. #12], ¶¶ 11-15.[1]  Before the Court is the motion of Swift & Sons for summary judgment [Doc. #15] on plaintiff's claim.  For the reasons that follow, the motion will be denied.

I.   **Factual Background**

Plaintiff Douglas is an African American man who was hired by Swift on December 4, 2000.  Aff. of Leroy Douglas, ¶¶ 2-3, Pl. Mem. of Law in Opp. to Def. Mot. for Summary Judgment [Doc. # 19], Ex. A.  Swift & Sons is a "gold leaf, hot stamping foil company" located in Hartford, Connecticut and owned and managed

---

[1]The Amended Complaint also alleges a retaliation claim, which plaintiff states he will not pursue. See Mem. of Law in Opp. to Def. Mot. for Summary Judgment [Doc. # 19] at 16.

1

by Allen Swift.  Aff. of M. Allen Swift, ¶ 4, Def. Appendix [Doc. #17], Ex. A.

The parties disagree on plaintiff's job description when he was hired at Swift & Sons.  Douglas states that he "was hired as a machinist to help maintain Swift's production machinery and to make replacement parts for the production machinery."  Douglas Aff. ¶ 4.  Plaintiff testified that he had approximately 10 years experience with manual machining, the type of work conducted at Swift & Sons.  Douglas Dep. at 31-32, Pl. Opp., Ex. B.  The classified  advertisement that Douglas answered reads:

> MACHINIST
> With job shop experience for a company in business  since  1887.   Hours  8  4:30. Resume: M Swift & Sons, 10 Love Lane, Hartford CT 06141-0160.

Newspaper Advertisement, Oct. 29, 2000, Def. Ex. B

Allen Swift stated that "although the advertisement indicated that Swift was looking to hire a 'machinist,' we were looking to hire a person who could machine and also assist with other maintenance tasks.  The employee would be a part of the Maintenance Department."  Swift Aff. ¶ 7.  He further stated that during his two interviews with Douglas, he "explained that the person hired would work on machines but also would perform other duties as required, including carpentry."  Swift Aff. ¶ 8.  A form prepared on Douglas's date of hire and signed by Douglas and Ramona Petronio, the executive secretary at Swift, states

"maintenance" under the category "job description."

When he interviewed at Swift & Sons, the plaintiff was working as a temporary machinist with another company and looking for a permanent job.  Douglas Dep. at 36.  He testified that he accepted the position at Swift & Sons because "the pay was about in the same bracket," the location was closer to his home, and because Mr. Swift told him that when he hired people, it was "more or less ... for life."  Id. at 35-36.

Plaintiff testified that Swift was his direct supervisor and the person who generally gave out the job assignments.  Douglas Dep. at 42-45.  When Swift was not available, jobs would be assigned by Petronio.  Id. at 45.  The third person in line was Frank Gorman, the office manager.  Id. at 43.

The head machinist at Swift & Sons was Everett Overstrum, a white male, whom Plaintiff contends prevented him from doing machinist work.  Douglas Aff. ¶ 6.  Plaintiff states that as many as three times per week he complained to Swift that he was not being given the machinist work that he was hired to do.  Id. at ¶ 7; Douglas Dep. at 47.  Swift would respond, "I told Mr. Overstrum I want you to help him with those machines out there, okay?"  Douglas Dep. at 47.  When Plaintiff would approach Overstrum, Overstrum would respond that he did not need help. Id.  Instead, he had an electrician named Ted Roberts, a white male, help him with machining work.  Id.; see also Douglas Aff. ¶

3

6.  Plaintiff asserts that "Mr. Swift never intervened [with
Overstrum] but rather assigned [plaintiff] menial tasks," such
as: sweeping and cleaning the machine area; shingling a house;
tarring a roof; repairing windows; replacing a fence;
waterproofing a wall; replacing missing shelves in Swift's desk;
labeling a storage building; "putting a new roller coupling on
sizer #6;" "fixing the leak in the steam return line in building
50;" "installing rolls in sizers;" repairing hot water tank
insulation; and others.  Douglas Aff. ¶ 7.

Plaintiff also testified to an incident where Joe Profit, an
African American employee who was close to Swift, prevented him
from doing machining work.  Plaintiff described Profit as a "big
guy" who was "the intimidator" for Swift.  Douglas Dep. at 62.
At one point, Douglas started running a lathe machine on his own
initiative to "upgrade" his skills.  Id. at 63.  Profit walked up
to him and told him to go do another job, and Douglas refused to
leave before he had finished making a part.  Profit "popp[ed] a
knife" and said to Douglas, "get off the machine."  Id.  Douglas
testified that Profit then tried to "play it off," but Douglas
felt that Profit was trying to intimidate him and "act[] like he
was the supervisor or boss..."  Id. at 64.

Plaintiff states that he actually completed only two
machining assignments at Swift.  When he first was hired he made
"two parts."  Douglas Dep. at 46.  After that he complained to

4

Swift many time about not being allowed to do the job for which he believed he was hired. Douglas Dep. 50, 92-93. He did not want to antagonize Swift and lose his job, but he was advised by Petronio to "complain harder" in order to get the work he wanted, and after four weeks of more frequent complaints, he was laid off. Id. at 51, 93; Douglas Aff. ¶ 12. On the day he was laid off, November 21, 2001, he was given a machining assignment and he thought it was suspicious because Overstrum and Profit were acting "friendly," which he considered "out of character" for them. Id. at 60.

Douglas testified that he received no advance notice of his layoff. Swift "just walked up to [him and] said I'm going to have to lay you off..." Douglas Dep. at 70. Douglas also stated that Swift offered no explanation for his layoff at the time. An unemployment notice dated November 21, 2001, plaintiff's last day on the job, cites "lack of work." Def. Ex. E.

The parties agree that three white female employees who held office positions were laid off from Swift & Sons the same day. Swift stated:

> ... I terminated Mr. Douglas and the other three employees because business had slowed and each of these workers was relatively limited in the skills they could contribute to Swift; I therefore lacked sufficient work for these workers.
>
> I did not ever tell Mr. Douglas that I found him less skilled as a machinist than what I had expected based on my interviews. I did not want to upset him and instead continued for as long as possible to utilize Mr. Douglas

to perform other work for which his skills were more
suited (e.g., carpentry).  By November 2001, however,
with business continuing to slow I was unable to find
enough other work to keep Mr. Douglas and the other
employees on the payroll.

Swift Aff. ¶¶ 14-15.

In January 2002, approximately two months after Plaintiff
was laid off, Defendant advertised in the Hartford Courant for a
machinist.[2]  Plaintiff saw the notice and called Frank Gorman at
Swift & Sons and asked for his job back.  Douglas Dep. at 77.
Gorman stated that he would talk to Swift and that Douglas should
call back in about a week.  Id.  When Douglas called back, Gorman
stated that Swift was not going to hire anyone.  Id. at 78.
Swift stated that in his view, Douglas lacked the machine skills
required for the position advertised.  Swift Aff. ¶ 20.

On April 1, 2002, Swift hired a white male named Michael
Haggerty.  He stated that he chose Haggerty "because [Haggerty]
had extensive manufacturing experience, and was an experienced
tool and die maker who also claimed that he had the ability to do
electrical work.  I knew that in addition to working as a
machinist, he would be able to assist with a variety of other
tasks (i.e., he could serve as an electrical helper on certain

---

[2]The newspaper advertisement reads:
                    MACHINIST - VERY EXP'D.
                    Requires all facets of machine
                    repair. Hours: 8am-430pm, Mo-Fr
                        Call Frank (860)522-1181
Def. Ex. F.

projects)."  Swift Aff. ¶ 21.

Douglas contends that he was not given machinist work at Swift & Sons, and eventually laid off, because of his race.  He testified that he never directly raised his concern about race discrimination with Swift or any other members of Swift & Sons' management.  However, he discussed it indirectly with several people.  First, he asked Petronio "many times" if there ever was a "a black machinist at this place."  Douglas Dep. at 52. Petronio responded that she did not know because had not worked at Swift & Sons for very long, so Douglas asked Profit, who responded that "there may have been one [black machinist at Swift] ... but ... I know one thing, you ain't getting no work." Id.  Plaintiff said that he told Profit that "it got to be because I'm black" that he was not getting machinist work, and Profit repeated, "I know one thing, you ain't getting anything pertaining to machinist work."  Id. at 151-52.  When asked at his deposition whether Profit meant that Douglas would not get machinist work because he was black, Douglas answered, "Well, I put it to you this way, he didn't have to say it, but you could assume it... ."  Id. at 152.

Another co-worker named Alberto said that Everett Overstrum, Ted Roberts "and all them said they weren't going to show [Douglas] anything because ... we don't have enough work around here for no machinist."  Id. at 53-54.  Alberto reported that

Overstrum said Douglas "should go someplace else."  Id. at 54.
Douglas stated, however, that neither Overstrum nor anyone in
Swift & Sons' management ever made any overt comments to him
about race.  Douglas Dep. at 50-54.

## II.  Standard

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with affidavits ... show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party
seeking summary judgment "bears the burden of establishing that
no genuine issue of material fact exists and that the undisputed
facts establish [its] right to judgment as a matter of law."
Rodriguez v. City of New York, 72 F.3d 1051, 1060-1061 (2d Cir.
1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157
(1970)).  "The duty of the court is to determine whether there
are issues to be tried; in making that determination, the court
is to draw all factual inferences in favor of the party against
whom summary judgment is sought, viewing the factual assertions
in materials such as affidavits, exhibits, and depositions in the
light most favorable to the party opposing the motion."  Id.
(citations omitted).  "If reasonable minds could differ as to the
import of the evidence ... and if there is any evidence in the
record from any source from which a reasonable inference in the

8

nonmoving party's favor may be drawn, the moving party simply cannot obtain [] summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations, alterations and quotations omitted).

## III.  Discussion

### A.    Title VII Framework

As the parties agree, this Title VII employment discrimination case should be analyzed under the familiar McDonnell Douglas/Burdine three prong burden-shifting framework.[3] Under that framework, Douglas first must establish a prima facie case of discrimination on account of race.  See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).  To do so, he must prove: (1) membership in a protected class; (2) qualification for his position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. See e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  The first three elements are not disputed here.  See Def. Mem. in Support of Mot. for Summary Judgment [Doc. # 16] at 11. Douglas is African American, was qualified for the position of

---

[3]Although Swift argues in its Reply, see [Doc. # 21] at 1, that Douglas also has asserted a hostile work environment claim, the Court does not read Plaintiff's Opposition to assert such a claim, and no such claim is asserted in the complaint, and therefore it will not be discussed.

machinist, and was laid off.  No one particular type of proof is required to satisfy the fourth element, rather it may take a variety of forms, including evidence that after the plaintiff was terminated, the defendant continued to advertise his position. Abdu-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 466-68 (2d Cir. 2002) (prima facie burden satisfied by showing "the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position"); Haywood v. Heritage Christian Home, Inc., 977 F. Supp. 611, 616 (W.D.N.Y. 1997) (prima facie burden satisfied by showing that plaintiff was told an advertised position was not available, while white applicant was told many positions were available); Alexander v. Computer Sciences Corp., No. Civ. 3:03CV1455 (JBA), 2005 WL 61495 at *5 (D. Conn. Jan. 11, 2005) (prima facie burden satisfied by showing that plaintiff's position was advertised on the internet after he was laid off).

Such proof shifts the burden to defendant "to produce evidence that the plaintiff was [terminated] for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing, 530 U.S. 133, 142 (2000) (internal citations, quotations, and alterations omitted).  It is satisfied if the proffered evidence "'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse

action.'"  Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir.
2000)(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509
(1993)).

If Swift & Sons articulates a race-neutral reason for
Douglas's termination, namely lack of business, Douglas may "come
forward with evidence that the defendant's proffered,
non-discriminatory reason is a mere pretext for actual
discrimination."  Weinstock, 224 F.3d at 42.  That is, the
plaintiff "may attempt to establish that he was the victim of
intentional discrimination by showing that the employer's
proffered explanation is unworthy of credence."  Reeves, 530 U.S.
at 143.

**B.   Analysis**

**1.   Prima Facie Case**

In this case, Douglas has established a prima facie case of
race discrimination.  Douglas has shown that merely two months
after he was laid off, Swift & Sons advertised in the newspaper
for a machinist, refused to hire Douglas back when he called to
inquire about the position, and instead gave the job to Michael
Haggerty, a white male.  Swift & Sons contends that Douglas was
not qualified for the job as advertised, but Douglas disputes
that assertion.  A reasonable jury could find that Douglas
originally was hired as a machinist, had 10 years experience and
numerous continuing education classes in machinist work, and

11

therefore was qualified for a machinist position.  Although Swift
states in his affidavit that he had been disappointed in
Douglas's machining skills, a reasonable jury could credit
Douglas's testimony that he was never given any significant
opportunity to do machinist work at Swift & Sons.  Swift
additionally states in his affidavit that he hired Haggerty
because Haggerty possessed electrician skills as well as
machinist skills, and therefore could assist with electrical
projects at Swift.  This explanation is controverted by Douglas's
testimony that Ted Roberts, an electrician, already was employed
at Swift and evidently not occupied full time with electrical
work because he was utilized by Overstrum to assist with
machinist work.  Thus, in showing that Swift & Sons continued to
advertise the position from which he was terminated, and for
which there is evidence he was qualified, and that Swift & Sons
eventually hired a white man for the position, plaintiff has met
his prima facie burden.

  **2.   Pretext**

  Swift & Sons asserts that Douglas was laid off because
business was slow and there was not enough work for a machinist.
Douglas asserts that this proffered reason is pretextual because
on the day of his layoff, they "had just torn out a machine [and]
it looked like it was quite a bit of work" left to be done.
Douglas Dep. at 69.  The day of his layoff was one of the only

opportunities Douglas had to do machinist work, and he was in the process of "doing some big rollers on the machine, like polishing them up and everything" when Allen Swift informed Douglas that he was to be laid off.  Id.  Additionally, as discussed, Swift & Sons advertised for another machinist approximately two months after Douglas was laid off, and hired Haggerty two months after that.  At the summary judgment stage the Court must draw all inferences in the plaintiff's favor, and in so doing the Court concludes that a reasonable jury could infer from these facts that Swift & Sons had enough work for a machinist and thus that the proffered legitimate, nondiscriminatory reason is not credible and is pretextual.

### 3.   Same Decision Maker

Defendant argues, nonetheless, that plaintiff has not put forth evidence that the defendant's layoff decision was motivated by racial bias.  Defendant points to Douglas's testimony that he never directly raised the issue of race discrimination with Swift or any other manager, and neither Overstrum nor others made any comments to him about race.  More specifically, defendant argues, citing Grady v. Affiliated Central, Inc., 130 F.3d 553 (2d Cir. 1997), that no reasonable juror could draw an inference of discrimination where the same individual – Allen Swift - made the decision to hire and fire the plaintiff within a short period of time.

13

The plaintiff in <u>Grady</u> brought an age discrimination complaint against a security alarm company.  The company terminated the plaintiff only eight days after she began work. <u>Id.</u> at 555.  The same manager, who was a year older than the plaintiff, made the decision to hire the plaintiff and fire her, and the reason given for the plaintiff's termination was that she was not learning the job as quickly as she should have.  <u>Id.</u> at 555-56.  In affirming the district court's grant of the company's motion for summary judgment, the Second Circuit wrote:

> Although each case must involve an examination of all the circumstances, some factors strongly suggest that invidious discrimination was unlikely.  For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.  This is especially so when the firing has occurred only a short time after the hiring.

<u>Id.</u> at 560.  The Court of Appeals further emphasized that the case was "bereft of evidence from which a factfinder could infer" discrimination because, among other reasons, the plaintiff was "unable to point to <u>any person</u> at [the company] whom she viewed as having an animus against older workers."  <u>Id.</u> at 561 (emphasis added).  The Second Circuit also cited the fact that the manager who hired and fired the plaintiff was older than the plaintiff, and that during the 15 month period surrounding the plaintiff's employment, the company terminated 10 people who held the same position as the plaintiff, all of whom were under the age of 28

except for the plaintiff.  <u>Id.</u>

<u>Grady</u> thus does not stand for the bare proposition that a plaintiff may never prove discrimination when the same individual has made the hiring and firing decisions.  In contrast to the facts of that case, plaintiff Douglas was employed at Swift for almost a year and the manager who hired and fired him was not a member of the same protected class.  More importantly, there is evidence that Overstrum, the head machinist, refused to work with the plaintiff.  A jury reasonably could infer that in firing Douglas, Swift was carrying out Overstrum's wishes, or attempting to avoid the conflict created by Overstrum's refusal to work with Douglas and Douglas's consequent ongoing complaints. In this way, the present case is distinguishable from <u>Grady</u>, where the plaintiff made no allegations that any particular person at the company harbored any discriminatory animus.

### 4.  Respondeat Superior

An employer may be held liable under Title VII if the decision maker did not harbor discriminatory animus but acted on biased information provided by lower-level supervisors who harbored such animus.  "[I]t is clear that 'impermissible bias of a single individual at any stage of the ... process may taint the ultimate employment decision ... even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias

15

played a meaningful role in the process.'" <u>Back v. Hastings on
Hudson Union Free School Dist.</u>, 365 F.3d 107, 125-26 (2d Cir.
2004) (quoting <u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435, 450 (2d
Cir. 1999)).  In <u>Back</u>, for instance, two direct supervisors of
the plaintiff, a school social worker, issued negative
evaluations and recommended against granting the plaintiff
tenure, allegedly because of their gender-based stereotype that
the plaintiff could not be sufficiently devoted to her job after
she had a child.  <u>Id.</u> at 126.  The school superintendent and,
ultimately, the Board of Education, did not conduct any
independent evaluation of the plaintiff's performance but instead
relied on the supervisors' recommendations in deciding not to
grant the plaintiff tenure and to terminate her employment.
Because the "Board's action, and [the superintendent's] negative
recommendation were certainly normal or foreseeable consequences
of [the supervisors'] negative recommendations," the Court of
Appeals reversed the district court's grant of summary judgment
to the defendant town.  <u>Id.</u> (internal citation and quotation
marks omitted).

    In <u>Jiles v. Ingram</u>, 944 F.2d 409, 413 (8th Cir. 1991), the
Court of Appeals upheld a district judge's conclusion after a
bench trial that the City of West Memphis, Arkansas, was liable
under Title VII for race discrimination against the plaintiff
firefighter.  The evidence showed that a lieutenant in charge of

the fire station where the plaintiff worked "did not want to work with [plaintiff] because he is black" and that the lieutenant contrived an incident of insubordination to get the plaintiff transferred to another station.  Id.  The district court found that the mayor and fire chief did not intend to discriminate against the plaintiff, but they fired the plaintiff after crediting the lieutenant's story concerning the alleged insubordination.  The Eighth Circuit held "[t]hat is sufficient proof of intentional discrimination by the City's agents to sustain the district court's conclusion that [the plaintiff's] resulting discipline, discharge, was the product of racially disparate treatment."  Id.

In the present case, Overstrum is not alleged to be Douglas's ultimate supervisor; Douglas testified that he received assignments from Swift himself.  However, Douglas also testified that he was assigned to help Overstrum, the head machinist, complete machinist work, and a jury could find that Overstrum possessed enough authority over Douglas to prevent Douglas from doing such work.  A jury could also reasonably find that Overstrum refused to work with Douglas because he was black, and he preferred instead to have Roberts, the white electrician, assist him with machinist work.  Douglas states that he complained numerous times to Swift about this situation, and that Swift refused to intervene with Overstrum.

17

Douglas testified that during his employment at Swift & Sons he never explicitly told Swift that he thought Overstrum was discriminating against him because of his race. However, Douglas also testified that he was not aware of any policy in place at Swift & Sons for dealing with complaints of job discrimination, and that to his knowledge there was no company handbook or policy manual in existence. Further, he testified that Profit told him that he would not be getting machinist work and that, between two African American employees, Profit did not have to say that it was because of race since Douglas understood the implication of Profit's comment. Finally, on several occasions Douglas asked Petronio, the executive secretary who acted on Swift's behalf when he was not available, whether Swift & Sons ever had hired a black machinist. These statements are sufficient for a jury to infer that those in upper management at Swift & Sons knew or should have known that Douglas believed Overstrum was discriminating against him in his job assignments because of race. A jury could further find that Overstrum in fact harbored discriminatory animus against Douglas and refused to work with him because of his race. Even if the jury did not find that Swift himself harbored discriminatory animus, a reasonable jury could find Swift & Sons liable under Title VII if it finds that, in terminating Douglas, Swift was acting on Overstrum's race-based preference or recommendation.

18

The Court thus finds that Douglas has raised minimally sufficient issues of material fact concerning Overstrum's motivation and influence on Swift's decisionmaking to preclude summary judgment in this case.  The "issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 248-49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)).  A reasonable jury in this case could potentially find that Douglas's termination was motivated by racial bias, and therefore summary judgment is not warranted.  The Court's holding at the summary judgment stage of this case does not imply any assessment of the plaintiff's likelihood of success at trial.

## IV.   CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment [Doc. # 15] is DENIED.

IT IS SO ORDERED.

_____
/s/
_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 25th day of May, 2005.**

19